UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

ROOSEVELT REED,

      Petitioner,

  v.

RON HAYNES,

      Respondent.

Case No. C17-1859-RAJ-JPD

REPORT AND RECOMMENDATION

## INTRODUCTION AND SUMMARY CONCLUSION

Petitioner Roosevelt Reed is a state prisoner who is currently confined at the Stafford Creek Corrections Center in Aberdeen, Washington.  He seeks relief under 28 U.S.C. § 2254 from a 2013 King County Superior Court judgment and sentence.  The operative petition in this action is petitioner's amended petition, filed on June 6, 2018.  Respondent has filed an answer to the amended petition and has submitted relevant portions of the state court record.  Petitioner has not filed any response to respondent's answer.  This Court, having carefully reviewed petitioner's amended petition, respondent's answer thereto, and the balance of the record, concludes that petitioner's petition for writ of habeas corpus should be denied and this action should be dismissed with prejudice.

REPORT AND RECOMMENDATION - 1

FACTUAL BACKGROUND

The Washington Court of Appeals, on direct appeal, summarized the facts underlying petitioner's conviction as follows:

> Based on allegations that Reed assaulted and severely injured his girlfriend, J.G., the State charged him with first degree assault. The State alleged the assault was a crime of domestic violence, was committed shortly after Reed's release from prison, and was part of an ongoing pattern of abuse.
>
> At trial, J.G. testified that she started dating Reed in the 1980s. They "were into drugs a lot." When J.G. became pregnant, she left Reed because she "didn't want to be on drugs" during her pregnancy. She later gave birth to a daughter, H.D. Reed is H.D.'s father.
>
> J.G. did not see Reed again until 2008. A friend in prison told her that an inmate, Roosevelt Reed, wanted to speak to her. J.G. and H.D. started talking to Reed by phone and visiting him in prison.
>
> In April 2012, Reed was released from prison and moved in with J.G. in Des Moines. Although they initially had only minor arguments, Reed became increasingly aggressive. He slapped J.G. on one occasion and would say things like "don't take me to that dark place . . . I have this dark place and you don't need to take me there." J.G. knew that Reed had been in prison for "hitting his girlfriend in the head with a brick," and that he "broke the windshield out on some girl that used to be with him." Reed also told her "how he would beat her up" H.D.'s half-sister's mother.
>
> In early September 2012, J.G. and Reed visited H.D. in Spokane. H.D. testified that Reed was controlling toward J.G., became angry over small things, and called her a "bitch." When Reed asked H.D. for help with his phone, she saw that he had been exchanging text messages with another woman. Later, as they were driving home from Spokane, Reed told J.G. that the messages were about a girl that he had "beat up" years ago. J.G. said the assault was not funny and that was why he went to jail. Reed became angry so J.G. pulled the car off the freeway. Reed then took the keys, drove off, and left her on the side of the road. When J.G. called him and threatened to call the police, Reed returned and drove them home.
>
> The incident at issue in this case occurred the next day. Reed testified that he had lunch that day with his friend Joe Kelley, who then drove him to his appointment with his Community Corrections Officer (CCO), Stacy Westberg. Kelley generally corroborated Reed's testimony. On cross-examination, Kelley conceded that he had refused to talk to a detective on the advice of Reed's lawyer.

REPORT AND RECOMMENDATION - 2

Kelley was also confused about the timing of events on the day of the assault and did not remember calling or receiving calls from Reed shortly after the assault. J.G. also had difficulty recalling events on the day of the assault and testified that she accompanied Reed to his DOC appointment. Cell phone records, however, suggested that she remained home during that time.

CCO Westberg testified that Reed seemed fine during his appointment until she told him that J.G. could no longer pick up his travel permits and that he had to pick them up himself. Reed became angry and left the office at approximately 4:05 p.m.

J.G. testified that when Reed arrived home they argued, possibly about money. Reed pushed her and she pushed him back. When she reminded him of their agreement not to fight anymore, he pushed her "really hard" into a wall. She then grabbed the gold chain necklace he was wearing and blacked out.

Reed denied arguing with J.G. or assaulting her. He claimed he arrived home and found her lying on the floor. Although she was semi-conscious, bleeding, and so swollen she was unable to talk, Reed did not call 911 because "I wanted to do my own investigation, because I took that personal." He testified that he administered first aid, putting ice on her for the swelling and getting rags and clothing for her wounds. He eventually told her she needed medical attention, but she said "no." Reed testified that he couldn't "force that."

At 4:34 p.m., Reed made the first of a series of phone calls to his brother, Precious Reed, and to Joe Kelley. He called Precious at 4:34 p.m., 4:36 p.m., 4:38 p.m. and 4:39 p.m. He received calls from Precious at 4:37 p.m. and 4:39 p.m. He called his own voicemail and Joe Kelley at 4:37 p.m. He received a call from Joe Kelley at 4:40 p.m., and a call from Shantell Reed's cell phone at 4:57 p.m. Reed did not call 911 until 5:07 p.m., over 30 minutes after his initial call to his brother.

Reed testified that during one of the calls to Precious, he said "man, somebody came in my house and almost killed the b-i-t-c-h." He explained that "b-i-t-c-h" was not derogatory and "can be considered honorable . . . in the African American language." The prosecutor explored this topic further on cross-examination:

> Q. But I just want to get this straight. When you think she's actually dying on the floor, you call your brother and said – you called her a bitch then?
> A. Yes.
> Q. When she's laying there, like half dead, on the floor, you're saying, I think someone killed the bitch; right?
> A. My

REPORT AND RECOMMENDATION - 3

      Q. My bitch?  Your bitch?  She's your bitch; right?
      A. (Witness nods head affirmatively.)

Precious's wife, Shantel Smith-Reed, testified that she overheard Reed's call to Precious.  According to Shantel, Reed said "I need you to get over here" and "I think I killed the bitch."

Detective Fred Gendreau of the Des Moines Police Department testified that he recorded a phone conversation with Precious.  On the recording, Precious says Reed called him and said "come over here and get the car; I think I killed her."  Precious later said the same thing when Detective Gendreau served him with a subpoena.  Precious also said that "what [Reed] did was wrong" and that Reed had an anger problem.  During his testimony, Precious reluctantly admitted making the statement in the recorded phone conversation but repeatedly noted that he was using drugs at the time.

Officer Kevin Montgomery of the Des Moines Police Department testified that he arrived at the assault scene at 5:14 p.m.  Reed told him he found J.G. lying in the doorway when he got home.  Reed told Precious that same day that "somebody kicked the door open."  Police, however, found no signs of a break-in or missing property.

Officer Montgomery asked Reed if he could account for the time between his departure from the DOC office and his 911 call.  Reed said he had "gone to a friend's house to pick up his vehicle."  Reed admitted during cross-examination, however, that he told his CCO that he left their meeting and went straight home.

Officer Anthony Nowacki testified that he tried to talk to J.G. at the scene, but she could not open her eyes or mouth and responded to questions with mumbles and groans.  Because they could not communicate with J.G., the police did not arrest Reed at that time.

An ambulance took J.G. and Reed to a hospital where J.G. was treated for multiple facial fractures.  She testified that doctors told her she would have been killed if she had been hit one or two more times.  She described the long-term effects of her injuries, stating:

> I can't feel any of my face.  I can't feel – I can feel from this part of my lip over.  And so like if I drink coffee, I have to put my tongue to it because my lip doesn't have any feeling.  And when I talk, my lip doesn't move.  It just feels like it has a piece of hard plastic or something in it.  It doesn't move.
> And as the day wears on, my eye closes down more and more.  As far as pain, anytime I lay down, I have migraines, so I'm on morphine for that . . . .

REPORT AND RECOMMENDATION - 4

> I don't know how many plates they have in my face, but I know there's little circles of plates. And I have plates up here. This whole part of my face right here was broke out, so there's plates connecting everything here.
>
> And my jaw was broke up like this. I can't chew any food on this side of my mouth because it feels like I'm chewing nothing because I can't do it. So if I eat the food, sometimes it will get caught up in my lip. I have to clean up. I drink water that has a spout on it. If I drink it on this side of my mouth, it runs out of my mouth.
>
> . . .
>
> . . . Usually you have a bone that hooks up into your cheekbone and everything. I'm missing all this bone. It's all metal from under my eye.

An emergency room social worker, Margaret Lake, testified that when Reed approached J.G. in her hospital room, J.G. immediately pulled away from him. Reed angrily told her to calm down. Lake said this was "a real unusual response for a family member."

The day after the assault, Detective Gendreau called J.G. and Reed answered the phone. Detective Gendreau identified himself as a police detective and asked to speak to J.G. Reed asked "why [he] was calling." Detective Gendreau thought Reed's question was suspicious given that J.G. had just been the victim of a serious assault.

J.G. told several different stories about the assault. She told several people she was attacked by an unknown person in her doorway. She told H.D. that she had been injured in a car accident. Eventually, however, she told H.D. and the police that Reed had assaulted her. She told H.D. "I just can't believe he did me like this."

H.D. testified that Reed admitted his guilt to her during a car ride, saying "you know I messed up, [H.D.], you know I messed up, you know I have anger issues." H.D. asked Reed why he hit J.G. even after she was unconscious. Reed replied "I felt like my freedom was jeopardized or at risk, and that I had nothing to lose." Reed told H.D. that if the truth ever came out, she would have to "watch [her] family's back." H.D. testified that she did not go to the police because of Reed's threat.

J.G. testified that she initially lied about the assault because she "still loved [Reed], however warped it might have been. That's my kid's dad." But she began to see things differently when Reed told her he was sick of hearing her complaints after the assault. J.G. eventually moved to Spokane where she reported the assault to authorities. The police then arrested Reed.

REPORT AND RECOMMENDATION - 5

Once in jail, Reed told Precious in recorded phone calls not to talk to detectives and to hide his cell phone. Reed said "you don't know nothing" and also told Reed to give the phone to defense counsel. Precious expressed concern because the phone was the one Reed called Precious from on the day of the assault. When police eventually recovered the phone, most of the data from the days surrounding the assault were missing and could not be recovered. Reed also instructed Precious to pawn his gold necklace. When Officers later recovered the necklace from the pawn shop, they discovered that the clasp had been broken and put back together.

Reed admitted his criminal past at trial. He testified on direct examination that he had lived on "another side of the law, drugs, alcohol" during the 80s and 90s. He said that he pleaded guilty in 1993 to assaulting a woman he "ran into . . . in the streets." They were "living a destructive lifestyle, and it was a bunch of cheating on both ends." Reed testified that he was also convicted of assault in 1999 and "was still involved in alcohol and drugs" at that time.

Prior to cross-examination, the prosecutor argued that the defense had opened the door to questions concerning the details underlying Reed's prior assaults. She asserted that J.G. and Reed's testimony concerning their former lifestyle opened the door to further questioning on that subject. The court ruled that Reed had opened the door to questions about the 1993 assault, including the fact that Reed was the victim's pimp and that he assaulted her because "she did not put money on his books."

The prosecutor then asked Reed to describe the nature of his relationship with the 1993 victim. Reed said he would rather not answer the question. After the court instructed him to answer, Reed said "I had prostitutes back then. That was part of the lifestyle that I was living in my past." When Reed said he assaulted the woman in 1993 because he felt used, the prosecutor said "wasn't that actually because she hadn't given you money?" Reed denied that explanation, but conceded that the victim told police that the assault arose from a dispute over money.

In closing argument, defense counsel said the police botched the investigation by failing to check Reed's hands for injuries, test blood-stained carpeting and clothing, photograph the door and Reed's chain necklace, and take Reed's and J.G.'s cell phones into evidence. Defense counsel also argued that text messages showed that J.G. was angry at Reed for leaving her and keeping her car. Counsel maintained that "she wanted to punish him" and did so by changing her original story to implicate him in the crime.

The jury convicted Reed as charged.

(Dkt. 17, Ex. 2 at 2-11 (footnotes omitted).)

REPORT AND RECOMMENDATION - 6

PROCEDURAL BACKGROUND

Petitioner appealed his judgment and sentence to the Washington Court of Appeals. (*See* Dkt. 17, Ex. 3.) On June 1, 2015, the Washington Court of Appeals issued an unpublished opinion affirming petitioner's judgment and sentence. (*Id.*, Ex. 2.) Petitioner next sought review in the Washington Supreme Court. (*Id.*, Ex. 5.) Petitioner presented the following issues to the Supreme Court for review:

> 1. The Appellate Court's Decision conflicts with Supreme Court precedence that Mr. Reed "OPENED THE DOOR" referring to a past relationship being "BAD", not being specific to which relationship or exact time, which allowed in inadmissible evidence without determining the Four Factors Required in Kilgore.
>
> 2. The Appellate Court's Decision was unreasonable that the "Strength of the State's Case, there is no reasonable probability that any . . . Deficient Performance by defense counsel affected the verdict." Allowing in past convictions that were not crimes of dishonesty, or found to be a "PATTERN" for the sole purpose of being extremely prejudicial, and defense counsel's not objecting or asking for a limiting instruction, was deficient performance that denied Mr. Reed his constitutional right to a fair trial.

(*Id.*, Ex. 5 at 1.)

The Washington Supreme Court denied petitioner's petition for review without comment on December 2, 2015, and the Court of Appeals issued its mandate terminating direct review on January 15, 2016. (*Id.*, Exs. 8, 9.)

On November 29, 2016, petitioner filed a personal restraint petition in the Washington Court of Appeals in which he argued that "the cumulative failures of counsel, denied him his rights to effective assistance of counsel and due process." (*Id.*, Ex. 10 at 4.) The Court of Appeals issued an order dismissing the petition on September 28, 2017. (*Id.*, Ex. 13.) Petitioner did not seek further review by the Washington Supreme Court, and the Court of Appeals issued a

REPORT AND RECOMMENDATION - 7

certificate of finality in petitioner's personal restraint proceedings on November 17, 2017. (Dkt. 17, Ex. 14.) Petitioner now seeks federal habeas review of his conviction.

GROUNDS FOR RELIEF

Petitioner presents the following grounds for relief in his amended petition for writ of habeas corpus:

> Ground one: Mr. Reed received ineffective assistance of counsel on the jury instructions on 4 different occasions. Where defense counsel was ineffective for failing to request a limiting instruction, and failing to object to the erroneous instructions.
>
> Ground two: Ineffective assistance of counsel for all the cumulative errors that trial counsel did.

(*See* Dkt. 25 at 21, 36.)

DISCUSSION

Respondent asserts in his answer to the amended petition that petitioner properly some, but not all, of his federal habeas claims. Specifically, respondent asserts that petitioner properly exhausted the parts of his first ground for relief alleging that trial counsel failed to request a limiting instruction concerning the use of evidence of petitioner's prior convictions, and failed to object to an instruction informing the jury that it could consider the evidence of petitioner's prior convictions for purposes of determining petitioner's credibility. (Dkt. 26 at 8.) Respondent argues that petitioner failed to properly exhaust the remaining allegation of ineffective assistance of counsel in his first ground for relief which related to another alleged instructional error. (*Id.*) Respondent further argues that petitioner failed to properly exhaust the entirety of his second ground for relief. Finally, respondent argues that the state courts reasonably denied petitioner's exhausted claims. (*Id.* at 14-17.)

REPORT AND RECOMMENDATION - 8

Exhaustion/Procedural Default

A state prisoner is required to exhaust all available state court remedies before seeking a federal writ of habeas corpus. 28 U.S.C. § 2254(b)(1). The exhaustion requirement is a matter of comity, intended to afford the state courts "an initial opportunity to pass upon and correct alleged violations of its prisoners' federal rights." *Picard v. Connor*, 404 U.S. 270, 275 (1971) (internal quotation marks and citations omitted). In order to provide the state courts with the requisite "opportunity" to consider his federal claims, a prisoner must "fairly present" his claims to each appropriate state court for review, including a state supreme court with powers of discretionary review. *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (citing *Duncan v. Henry*, 513 U.S. 364, 365 (1995), and *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999)).

It is not enough that all the facts necessary to support a prisoner's federal claim were before the state courts or that a somewhat similar state law claim was made. *Anderson v. Harless*, 459 U.S. 4, 6 (1982). The habeas petitioner must have fairly presented to the state courts the substance of his federal habeas corpus claims. *Id*. "If a petitioner fails to alert the state court to the fact that he is raising a federal constitutional claim, his federal claim is unexhausted regardless of its similarity to the issues raised in state court." *Johnson v. Zenon*, 88 F.3d 828, 830 (9th Cir. 1996).

A habeas petitioner who fails to meet a state's procedural requirements for presenting his federal claims deprives the state courts of the opportunity to address those claims in the first instance. *See Coleman v. Thompson*, 501 U.S. 722, 732 (1991). Presenting a new claim to the state's highest court in a procedural context in which its merits will not be considered absent special circumstances does not constitute fair presentation of the claim for exhaustion purposes.

REPORT AND RECOMMENDATION - 9

*Roettgen v. Copeland*, 33 F.3d 36, 38 (9th Cir. 1994) (citing *Castille v. Peoples*, 489 U.S. 346, 351 (1989)).

The record confirms that petitioner properly exhausted the parts of his first ground for relief alleging that trial counsel failed to request a limiting instruction concerning the use of evidence of petitioner's prior convictions, and that counsel failed to object to an instruction informing the jury that it could consider the evidence of petitioner's prior convictions for purposes of determining petitioner's credibility, by presenting those claims to both the Washington Court of Appeals and the Washington Supreme Court on direct appeal.  (*See* Dkt. 17, Exs. 3, 5.)  The record likewise confirms that petitioner failed to properly exhaust the part of his first ground for relief alleging that counsel failed to object to an erroneous "prolonged period of time" instruction, and the cumulative error claim asserted in his second ground for relief, because, though petitioner presented those claims to the Washington Court of Appeals in his personal restraint petition, he never sought review of the claims by the Washington Supreme Court.  (*See id*., Ex. 10, 14.)

When a petitioner fails to exhaust his state court remedies and the court to which petitioner would be required to present his claims in order to satisfy the exhaustion requirement would now find the claims to be procedurally barred, there is a procedural default for purposes of federal habeas review.  *Coleman*, 501 U.S. at 735 n. 1.

Respondent argues that petitioner, having failed to properly exhaust some of his federal habeas claims, would now be barred from presenting those claims to the state courts under RCW 10.73.090.  (Dkt. 26 at 18.)  RCW 10.73.090(1) provides that a petition for collateral attack on a judgment and sentence in a criminal case must be filed within one year after the judgment becomes final.  Petitioner's judgment became final for purposes of pursuing a collateral attack in

REPORT AND RECOMMENDATION - 10

state court on January 15, 2016, the date the Washington Court of Appeals issued its mandate on direct appeal. *See* RCW 10.73.090(3)(b). It therefore appears clear that petitioner would now be time barred from returning to the state courts to present his unexhausted claims. This Court therefore concludes that petitioner has procedurally defaulted on the part of his first ground for relief alleging that he was denied effective assistance of counsel when counsel failed to object to an erroneous "prolonged period of time" instruction, and on the cumulative error claim asserted in ground two.

When a state prisoner defaults on his federal claims in state court, pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or can demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 750.

Petitioner asserts in his amended petition that any procedural default resulting from his failure to present some of his ineffective assistance of trial counsel claims to all levels of the state courts for review should be excused under the rule announced by the United States Supreme Court in *Martinez v. Ryan*, 566 U.S. 1 (2012). (Dkt. 25 at 19-20.) In *Martinez*, the Supreme Court announced a limited qualification to the holding in *Coleman* that an attorney's ignorance or inadvertence in a post-conviction proceeding does not establish cause which excuses procedural default. *See id*. at 9. The narrow exception recognized in *Martinez* is that the absence of counsel, or the inadequate assistance of counsel, in an initial-review collateral proceeding may establish cause for a claim of ineffective assistance at trial. *See id*. at 14.

As noted by respondent, the Supreme Court in *Martinez* made clear that the narrow exception recognized therein applied only to "initial-review" collateral proceedings. The

REPORT AND RECOMMENDATION - 11

Supreme Court explained that "[t]he holding in this case does not concern attorney errors in other kinds of proceedings, including appeals from initial-review collateral proceedings, second or successive collateral proceedings, and petitions for discretionary review in a State's appellate courts." *Martinez*, 566 U.S. at 16.  In this case, petitioner presented the ineffective assistance of trial counsel claims at issue to the Washington Court of Appeals in his personal restraint petition; *i.e.*, the "initial-review" collateral proceeding.  Petitioner's default occurred when he failed to seek discretionary review in the Washington Supreme Court.  Thus, *Martinez* does not apply and the *Coleman* rule governs instead.

To satisfy the "cause" prong of the cause and prejudice standard, petitioner must show that some objective factor external to the defense prevented him from complying with the state's procedural rule.  *Coleman*, 501 U.S. at 753 (citing *Murray v. Carrier*, 477 U.S. 478, 488 (1986)).  To show "prejudice," petitioner "must shoulder the burden of showing, not merely that the errors at his trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982) (emphasis in original).  Only in an "extraordinary case" may the habeas court grant the writ without a showing of cause or prejudice to correct a "fundamental miscarriage of justice" where a constitutional violation has resulted in the conviction of a defendant who is actually innocent.  *Murray*, 477 U.S. at 495-96.

Petitioner appears to assert in his amended petition that he did not file a motion for discretionary review in the Washington Supreme Court following the Court of Appeals' dismissal of his personal restraint petition because he was unaware of the 30 day deadline for doing so.  (See Dkt. 25 at 18.)  However, the Ninth Circuit has made clear that a pro se litigant "must be held accountable for his failure to timely pursue his remedy to the state supreme court."

REPORT AND RECOMMENDATION - 12

*Hughes v. Idaho State Bd. of Corrections*, 800 F.2d 905, 909 (9th Cir. 1986).  Accordingly, petitioner's failure to timely pursue his state court remedies does not constitute cause such as would excuse his procedural default.  Because petitioner has not met his burden of demonstrating cause for his procedural default, this Court need not determine whether there was any actual prejudice.  *Cavanaugh v. Kincheloe*, 877 F.2d 1443, 1448 (9th Cir. 1989) (citing *Smith v. Murray*, 477 U.S. 527, 533 (1986)).  In addition, petitioner makes no colorable showing of actual innocence.  Petitioner therefore fails to demonstrate that his unexhausted claims are eligible for federal habeas review and, thus, his amended federal habeas petition should be denied with respect to the part of his first ground for relief alleging that he was denied effective assistance of counsel when counsel failed to object to an erroneous "prolonged period of time" instruction, and with respect to the cumulative error claim asserted in ground two.

Standard of Review for Exhausted Claims

Federal habeas corpus relief is available only to a person "in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  A habeas corpus petition may be granted with respect to any claim adjudicated on the merits in state court only if the state court's decision was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or if the decision was based on an unreasonable determination of the facts in light of the evidence presented.  28 U.S.C. § 2254(d).

Under the "contrary to" clause, a federal habeas court may grant the writ only if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts.  *See Williams v. Taylor*, 529 U.S. 362, 405-06 (2000).  Under the "unreasonable application" clause, a federal habeas court may grant the writ only if the state

REPORT AND RECOMMENDATION - 13

court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case. *See Williams*, 529 U.S. at 407-09.

The Supreme Court has made clear that a state court's decision may be overturned only if the application is "objectively unreasonable." *Lockyer v. Andrade*, 538 U.S. 63, 69 (2003). The Supreme Court has further explained that "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 88 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

Clearly established federal law means "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision." *Lockyer*, 538 U.S. at 71-72. "If no Supreme Court precedent creates clearly established federal law relating to the legal issue the habeas petitioner raised in state court, the state court's decision cannot be contrary to or an unreasonable application of clearly established federal law." *Brewer v. Hall*, 378 F.3d 952, 955 (9th Cir. 2004) (citing *Dows v. Wood*, 211 F.3d 480, 485-86 (9th Cir. 2000)).

In considering a habeas petition, this Court's review "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181-82 (2011). If a habeas petitioner challenges the determination of a factual issue by a state court, such determination shall be presumed correct, and the applicant has the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

REPORT AND RECOMMENDATION - 14

Ineffective Assistance of Counsel

Petitioner asserts that he was denied effective assistance of counsel when his trial counsel failed to request a limiting instruction concerning the use of evidence of petitioner's prior convictions, and failed to object to an instruction informing the jury that it could consider the evidence of petitioner's prior convictions for purposes of determining petitioner's credibility. (Dkt. 25 at 21-24.)

The Sixth Amendment guarantees a criminal defendant the right to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668 (1984). "The essence of an ineffective-assistance claim is that counsel's unprofessional errors so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect." *Kimmelman v. Morrison*, 477 U.S. 365, 374 (1986). Claims of ineffective assistance of counsel are evaluated under the two-prong test set forth in *Strickland*. Under *Strickland*, a defendant must prove (1) that counsel's performance was deficient and, (2) that the deficient performance prejudiced the defense. *Strickland*, 466 U.S. at 687.

With respect to the first prong of the *Strickland* test, a petitioner must show that counsel's performance fell below an objective standard of reasonableness. *Id*. at 688. Judicial scrutiny of counsel's performance must be highly deferential. *Id*. at 689. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id*. at 689. In order to prevail on an ineffective assistance of counsel claim, a petitioner must overcome the presumption that counsel's challenged actions might be considered sound trial strategy. *Id*.

REPORT AND RECOMMENDATION - 15

The second prong of the *Strickland* test requires a showing of actual prejudice related to counsel's performance. In order to establish prejudice, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. The reviewing court need not address both components of the inquiry if an insufficient showing is made on one component. *Id*. at 697.

While the Supreme Court established in *Strickland* the legal principles that govern claims of ineffective assistance of counsel, it is not the role of the federal habeas court to evaluate whether defense counsel's performance fell below the *Strickland* standard. *Harrington*, 562 U.S. 101. Rather, when considering an ineffective assistance of counsel claim on federal habeas review, "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable." *Id*. As the Supreme Court explained in *Harrington*, "[a] state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself." *Id*.

The Washington Court of Appeals rejected petitioner's ineffective assistance of counsel claim on direct appeal. The Court of Appeals explained its conclusion as follows:

> Reed next contends his trial counsel was ineffective for failing to object to an instruction that allowed the jury to consider his assault convictions solely for determining the weight and credibility of his testimony. He also contends counsel should have requested a limiting instruction precluding the jury from using the convictions for propensity. But even assuming defense counsel's performance was deficient, there is no reasonable probability counsel's omissions affected the outcome of the trial.
>
> To prevail on an ineffective assistance claim, Reed must establish both deficient performance and prejudice. [Court's footnote: Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); State v. McFarland, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995).] The prejudice requirement is satisfied if there is "a reasonable probability that, but for counsel's unprofessional

REPORT AND RECOMMENDATION - 16

errors, the result of the proceeding would have been different." [Court's footnote: Strickland, 466 U.S. at 694.] "A reasonable probability is a probability sufficient to undermine confidence in the outcome." [Court's footnote: Id.] There is no reasonable probability that the outcome of the trial would have been different but for counsel's alleged omissions.

As noted above, the evidence against Reed was extremely strong, if not overwhelming. His brother and sister-in-law either testified or told others that he said "I think I killed the bitch." J.G. testified that Reed assaulted her and explained why she did not immediately implicate him. J.G.'s daughter H.D. testified that Reed admitted the assault to her. Significantly, despite J.G.'s severe injuries, Reed did not call 911 for a least a half an hour and instead made multiple phone calls to his brother and his friend Joe. He even checked his phone messages. His explanation for not immediately calling 911 was that he wanted to do his own research and that J.G. did not want medical help. Given the severity of J.G.'s injuries, a jury was entitled to decide that these explanations were not credible. Likewise, the fact that police found no evidence of forced entry or missing property severely undermined the defense's unknown intruder theory.

In addition, Reed's post-assault conduct was highly incriminating. He instructed his brother to hide his phone, not to talk to the police, and to pawn his necklace. When police recovered the phone, they discovered that data from the day of the assault and the two days immediately following the assault had been deleted. When police recovered Reed's necklace, the clasp appeared to have been broken and put back together. Reed also acted strangely in J.G.'s hospital room and she drew away from him when she saw him. When police wanted to talk to J.G. the day after the assault, Reed asked "why?"

Finally, neither attorney mentioned the instruction regarding Reed's prior convictions in closing argument. Nor did counsel suggest that the convictions could be used for propensity purposes or to assess his credibility. In light of the evidence and arguments in this case, there is no reasonable probability that any deficient performance affected the outcome.

(Dkt. 17, Ex. 2 at 13-15.)

Petitioner argues here, as he did in his opening brief on appeal, that counsel's failure to object to the instruction informing the jury that it could consider evidence of petitioner's prior convictions for purposes of determining his credibility prejudiced him because he denied that he had assaulted J.G., and his own testimony was crucial to explain what happened at the time of

REPORT AND RECOMMENDATION - 17

the incident.  (*See* Dkt. 25 at 28.)  Petitioner maintains that by allowing the jury to consider his prior assaults for credibility purposes, his theory of the case was undermined.  (*Id*.)  Petitioner also argues that counsel's failure to request a limiting instruction concerning use of his prior convictions prejudiced him because, in the absence of such an instruction, a reasonable juror would probably conclude that petitioner's prior violent assaults against women made it more likely he would also violently assault J.G.  (*Id*. at 29.)

These renewed arguments do nothing to call into question the reasonableness of the Washington Court of Appeals' conclusion that petitioner was not prejudiced by counsel's alleged errors regarding the jury instructions.  Petitioner's theory of the case was that the assault was committed by some unknown assailant while petitioner was away from their apartment, and that J.G. accused him of the assault because she was angry he had decided to leave her and would not return her car, and so she wanted to punish him.  (*See* Dkt. 17, Ex. 26 at 339-342, 435, 438-440.)  However, this Court's review of the trial transcript confirms that there was a dearth of evidence to support petitioner's unknown intruder theory and that the evidence that petitioner committed the assault was "extremely strong, if not overwhelming."  Given the substantial weight of the evidence against petitioner, the Court of Appeals reasonably concluded that there was no reasonable probability that counsel's omissions affected the outcome of petitioner's trial.  As the record makes clear that the Court of Appeals reasonably applied the *Strickland* standard in rejecting petitioner's ineffective assistance of counsel claim, petitioner's amended petition for writ of habeas corpus should be denied with respect to this claim.

Certificate of Appealability

A petitioner seeking post-conviction relief under § 2254 may appeal a district court's dismissal of his federal habeas petition only after obtaining a certificate of appealability (COA)

REPORT AND RECOMMENDATION - 18

from a district or circuit judge. A certificate of appealability may issue only where a petitioner has made "a substantial showing of the denial of a constitutional right." See 28 U.S.C. § 2253(c)(3). A petitioner satisfies this standard "by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). Under this standard, this Court concludes that petitioner is not entitled to a certificate of appealability with respect to any of the claims asserted in his petition.

## CONCLUSION

For the reasons set forth above, this Court recommends that petitioner's amended petition for writ of habeas corpus be denied and that this action be dismissed with prejudice. This Court also recommends that a certificate of appealability be denied with respect to all claims asserted in this federal habeas action. A proposed order accompanies this Report and Recommendation.

Objections to this Report and Recommendation, if any, should be filed with the Clerk and served upon all parties to this suit by no later than **November 13, 2018**. Failure to file objections within the specified time may affect your right to appeal. Objections should be noted for consideration on the District Judge's motion calendar for the third Friday after they are filed. Responses to objections may be filed within **fourteen (14)** days after service of objections. If no timely objections are filed, the matter will be ready for consideration by the District Judge on **November 16, 2018.**

//

//

//

REPORT AND RECOMMENDATION - 19

This Report and Recommendation is not an appealable order. Thus, a notice of appeal seeking review in the Court of Appeals for the Ninth Circuit should not be filed until the assigned District Judge acts on this Report and Recommendation.

DATED this 22nd day of October, 2018.

*James P. Donohue*
JAMES P. DONOHUE
United States Magistrate Judge

REPORT AND RECOMMENDATION - 20